UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CLYDE J. RIXNER | * | CIVIL ACTION NO. 22-419 |
| | * | |
| VERSUS | * | SECTION: "J"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE CARL J. BARBIER |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *********************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Clyde Rixner, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423, 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 24) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 26) be GRANTED.

**Procedural Background**

Mr. Rixner applied for SSI and DIB on July 1, 2019, asserting a disability onset date of September 1, 2016. He alleged the following illnesses, injuries, or conditions: seizures, back problems, high blood pressure, vision problems, memory problems, depression, anxiety, insomnia, and visual hallucinations. The state agency denied his claim on November 4, 2020. Upon reconsideration, the state agency again denied his claim on January 15, 2021.

Mr. Rixner requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 27, 2021. On December 23, 2021, the ALJ issued an adverse decision. Mr. Rixner timely appealed to the Appeals Council, which denied review on February 3, 2022.

On February 17, 2022, Mr. Rixner filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 10, 11). The parties filed cross-motions for summary judgment. (Rec. Docs. 24, 26). Mr. Rixner has been represented by counsel as of at least July 11, 2019.

**Evidence in the Record**

*1. Hearing Testimony*

At the beginning of the hearing, the ALJ sought consent from Mr. Rixner and his counsel to proceed by phone due to the coronavirus pandemic. R. at 33. At first, Mr. Rixner stated that he did not understand and that the ALJ should speak with his auntie. Id. Mr. Rixner's counsel stated that he did not think waiting to proceed in person would help and that he had tried to prepare Mr. Rixner for the hearing and "just gave up." R. at 34. He said he concluded that Mr. Rixner should just say what he wanted to say and "it'll show." Id. Mr. Rixner then agreed to proceed by phone. Id.

Mr. Rixner was 50 years old at the time of the hearing. R. at 36. He finished high school. Id. He is left handed. Id.

The ALJ explained to Mr. Rixner's counsel that the hearing was not the only hearing set for that day. R. at 37. He stated that he was committed to making sure that Mr. Rixner had a full and fair hearing, and that if they could not finish by 20 minutes past the hour, the ALJ would be happy to reschedule Mr. Rixner's case to another day for a supplemental hearing. Id.

The ALJ asked Mr. Rixner about his past work as an operator at a sugar mill. R. at 38. Mr. Rixner stated that he had not worked there since he got sick in 2014 and he could not remember what he was doing as an operator. Id.

The ALJ explained that he would ask Mr. Rixner about his condition in December 2016 and presently. R. at 39. He asked Mr. Rixner about his memory for things that happened in 2016, and Mr. Rixner stated that he did not remember anything. Id.

The ALJ then asked Mr. Rixner what was keeping him from working now. R. at 40. Mr. Rixner testified that he cannot see and cannot drive. Id. He said his back was always hurting and that he was "salty." Id. He said that he does not do anything anymore but sleep and that he was getting depressed answering the ALJ's questions because he does not like to be in the house all day. Id. He stated that he felt disgusting and that he was not going to keep taking his anxiety medication because it only made him tired. Id. He reported that he was getting angry. Id.

The ALJ asked Mr. Rixner how much he was sleeping each day, and Mr. Rixner stated he sleeps as soon as he sits down but he does not look at the time. R. at 41. He stated that he did not even know the days of the week anymore. Id. He reported that he felt uncomfortable about others taking care of him. Id.

Mr. Rixner testified that when he is awake he does not do anything. Id. He closes his eyes and looks at the ceiling fan. Id.

The ALJ asked Mr. Rixner about the medications he was taking and his doctors' visits. R. at 42. Mr. Rixner said he takes whatever they give him and sometimes he does not know what it is for. Id. He said he goes to the doctor whenever they tell him to go, that he will call someone like his auntie to take him, and that his auntie takes care of all of his business. Id.

Mr. Rixner testified that he was feeling weak and that his tongue felt heavy. R. at 43. He said that his tongue feels heavy on the left side when a seizure is coming on. R. at 43. He testified that he used to get seizures every 15 minutes, but he did not know how often he gets them presently. Id.

Mr. Rixner's counsel was given an opportunity to ask him questions, but he was warned by the ALJ that leading questions that ask for a yes or no answer or that suggest an answer would not be allowed. R. at 44. The ALJ noted that "[i]f you think you have no other choice except to ask Mr. Rixner leading questions, [counsel], let me know and I'll permit it. But I will let you know that leading questions really do strip testimony of power for me." R. at 44.

Mr. Rixner testified that he cannot lift anything because he cannot see anything and because his back and legs hurt. R. at 45. He never walks because he gets tired first. Id. He remembered living in Minnesota, but he could not recall injuring his back while shoveling snow as one of his medical records stated. Id. He said he could not shovel snow. R. at 46. He said he could not be in a chair for too long because his back and buttocks would ache. Id. He elevates his legs on two pillows at the recommendation of one of his doctors. Id.

The ALJ then cautioned Mr. Rixner's counsel that he was beginning to ask leading questions (such as "Do you have any problems using your hands?"), which would not be permitted. R. at 47. Mr. Rixner's counsel revised his question to ask what Mr. Rixner could do with his hands. Id. Mr. Rixner responded that he cannot do much of anything other than putting water in them to drink at the faucet. Id. He was not comfortable talking about it, but he stated that his "bottom part" hurt and that he was not sure if it might be his prostate. R. at 49.

4

Mr. Rixner testified that he had had a problem with blood clots because he had too many injuries to his head. R. at 49. It was cutting off oxygen to his brain. Id. He was prescribed coumadin. Id. He suffers from insomnia and cannot sleep well. Id.

Vocational expert Hannah Roberts testified at the hearing. R. at 50. She classified Mr. Rixner's past work as a bulk sugar plant operator, Dictionary of Occupational Titles ("DOT") code 520.362-010, light, SVP of 5. Id.

The ALJ asked the vocational expert to consider a hypothetical individual with Mr. Rixner's age and education and capable of occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; standing and/or walking for about six hours in an eight-hour workday; and sitting for about six hours in an eight-hour workday. R. at 51. The person is further limited to never climbing ladders, ropes or scaffolds; and must avoid all exposure to unprotected heights, dangerous machinery, and moving machinery. Id. The person can understand, carry out, and remember simple instructions and make commensurate work-related decisions; respond appropriately to supervision, coworkers, and work situations; deal with routine changes in work setting; and maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout a normal workday. Id. The person is also limited to simple, routine, and repetitive tasks and occasional interaction with co-workers, supervisors, and the general public. Id.

The vocational expert testified that such a person could not perform Mr. Rixner's past work. R. at 52. She testified that he could perform the job of a housekeeping cleaner, DOT 323.687-014, light with an SVP of 2 and 359,059 jobs available in the national economy. Id. The ALJ asked whether there were any visual requirements for the position, and the vocational expert testified that there were not. Id. The vocational expert testified that the person could also perform

work as a laundry sorter, DOT 361.687-014, light with SVP of 2 and 175,000 jobs available in the national economy. R. at 53. He could also perform the job of office helper, DOT 239.567-010, light with SVP of 2 and 190,000 jobs available in the national economy. Id.

The ALJ next asked the vocational expert to consider the same hypothetical individual if he was further limited to occasionally lifting and/or carrying ten pounds; frequently lifting and/or carrying less than ten pounds; standing and/or walking for about two hours in an eight-hour workday; and sitting for about six hours in an eight-hour workday. R. at 53. The ALJ testified that such a person could perform work as a surveillance monitor, DOT 379.367-010, sedentary with SVP 2 and 140,000 jobs in the national economy; addresser, DOT 209.587-010, sedentary with SVP 2 and 96,560 jobs in the national economy; and sorter, DOT 521.687-086, sedentary with SVP of 2 and 140,000 jobs in the national economy. R. at 53-54. The ALJ then asked the vocational expert to identify any visual requirements for all of the jobs she had mentioned. R. at 54. She testified that laundry sorter, officer helper, and each of the sedentary jobs she had identified did not have any visual requirements. R. at 55. She also testified that her testimony had been consistent with the DOT. Id. She further testified that employers would not tolerate absences of more than two days per month or being off task for more than 15 percent of the workday. Id.

Mr. Rixner's counsel then questioned the vocational expert about her testimony on visual requirements. R. at 56. She confirmed that the DOT contained no visual requirements. Id. Counsel asked whether this means that a person who has to watch a surveillance system does not need good vision. Id. The vocational expert agreed. Id. Counsel asked whether this means that a person who was blind could perform work as a surveillance monitor. Id. The vocational expert stated that a completely blind person could not perform the job. Id. Counsel asked whether a person who had lost 50 percent of his vision could perform the job. Id. The vocational expert testified that she

would need more detail about how their vision was impaired. <u>Id.</u>  The ALJ instructed counsel to rephrase the question using vocationally relevant terms. R. at 57. Counsel asked whether the person could perform the job if he could not read fine print or see small objects. <u>Id.</u> The vocational expert testified that the surveillance monitor job would most likely be excluded. <u>Id.</u>

Counsel then asked if the other jobs would be precluded. R. at 58. The vocational expert testified no. <u>Id.</u>  But when questioned specifically about the addresser position, which involves copying addresses onto envelopes and packages, she said "it's subjective. It's difficult to answer. Not every address that you would copy would potentially be in small print." <u>Id.</u>

Counsel asked whether a person who did not have good depth perception could perform the cited jobs. R. at 58. The vocational expert testified that she believed they could perform the positions. <u>Id.</u>  Counsel asked again whether, based on the vocational expert's experience, a person with "50 percent of the loss of vision" would be able to do the cited jobs. R. at 59. The ALJ interrupted and stated that the vocational expert had been unable to answer that question the previous time he had asked it. <u>Id.</u>  The vocational expert confirmed that she had not felt comfortable answering the question when it was asked in that way. <u>Id.</u>

Counsel then asked the ALJ permission to ask the vocational expert leading, yes or no questions. R. at 60. The ALJ agreed. <u>Id.</u>  The attorney then asked whether the vocational expert could name three employers for jobs that a person could perform with a loss of 50 percent of their vision. <u>Id.</u>  The ALJ again intervened and stated that the vocational expert had not been comfortable answering that type of question. <u>Id.</u>  The ALJ instructed counsel to phrase the question in vocationally relevant terms. <u>Id.</u>  Counsel stated "Well, I don't want to waste anymore of the Court's time if that's the vocational expert's opinion that she feels he could work. Why ask any

more questions then?" R. at 61. The ALJ again explained that counsel simply needed to ask his questions using vocationally relevant terms. Id.

Counsel asked whether a person who could only occasionally use his non-dominant hand for fine or gross manipulations could perform the listed jobs. R. at 61. The vocational expert testified that although the DOT does not specify the use of a dominant or non-dominant hand, based on her experience, the cited jobs could be performed. Id.

Counsel stated that he objected to the vocational expert's testimony and that he would like to file a response brief to her testimony. R. at 61-62. The ALJ offered a deadline of two weeks for him to do so. Id.  But then counsel changed course and stated that he would prefer a decision be issued and he would just file his objections into the record for appeal. R. at 63. The ALJ did not set a deadline, but stated that if counsel's brief was received prior to his decision he would be happy to take a look at it. Id.

The ALJ then allowed Mr. Rixner's counsel to give a closing statement. R. at 64-65. Counsel argued that the reason Mr. Rixner can no longer work is due to his cognitive impairments. R. at 64. He explained that when he tried to prepare Mr. Rixner, he would answer questions that had not been asked, he would forget what had just been explained, and he would get angry because he felt there were too many questions. Id.  Counsel further argued that it was difficult to believe that a person with visual limitations prescribed by the consultative examiner, such as not being able to walk in the hallway without running into people, would be able to perform the jobs identified by the vocational expert. R. at 65.

Correspondence from Mr. Rixner's counsel indicates that following the hearing, on October 28, November 9, and December 6, 2021, he submitted to the ALJ eight written

interrogatories that he wanted to the vocational expert to answer.[1] R. at 229, 370, 375. The ALJ did not have the vocational expert answer the interrogatories. Id.

  *2.  Evidence of Visual Impairments*

Mr. Rixner presented at the Teche Action Clinic on April 14, 2016, for a follow-up visit of routine health maintenance, hypertension, and seizure disorder. R. at 387. He reported no eye pain, loss or blurring of vision, or double vision. R. at 389. Upon examination, it was noted that Mr. Rixner's eyes had normal orbit and globe, normal conjunctivae, normal cornea, and normal lids. Id. His pupils were equal in size, round, and reactive to light and accommodation. Id.  His vision was normal to finger count. Id.

On July 13, 2016, Mr. Rixner presented to HCMC Medicine Clinic in Minnesota to establish care. R. at 585. Upon physical examination, his eyes were anicteric and his conjunctivae and corneas were clear. Id.  There were no complaints or treatment related to vision. Id.

On November 7, 2016, Mr. Rixner presented to Northpoint Health & Wellness Center in Minnesota. R. at 600. He complained it was hard to see near and hard to see small print. Id. It was noted that Mr. Rixner had been color blind since childhood and that his last eye exam was five years prior. Id.  He reported occasional "floaters" and an increase in light sensitivity. Id.  He was diagnosed with suspicious optic nerve cupping, bilateral and prescribed eye drops. R. at 400. He was also diagnosed with an astigmatism with presbyopia, pterygium, and dry eyes and was prescribed additional eye drops. Id.  He was also prescribed glasses. Id.  For visual acuity, he was measured at 20/20 in both his left and right eyes. Id.

---

[1] It appears that Mr. Rixner's counsel wrote a letter to the Appeals Council requesting review and citing the ALJ's failure to forward the interrogatories to the vocational expert on December 20, 2021, prior to the ALJ issuing his decision on December 23, 2021. R. at 229.

Mr. Rixner presented to the Northpoint Health & Wellness Center on March 21, 2017, to establish care. R. at 653, 656. It was noted that an MRI study was performed on August 31, 2016, showing an unremarkable brain MRI with and without contrast and mild periventricular and subcortical foci of increased FLAIR signal intensity, non-specific and may represent prior traumatic, inflammatory, or infectious insult and/or sequela of substance abuse. R. at 653. It was noted that he had been treating with 100mg bid Keppra for seizures since November 2016 and that his last seizure was in June 2016 when he was on a regimen of 500 mg Keppra daily. Id. He denied headache or blurred vision. Id. His "problem list" included pterygium and suspicious optic nerve cupping of both eyes. R. at 655. However, no assessment or plan related to vision was made. R. at 656-57. Of note, the problem list included pterygium and suspicious optic nerve cupping of both eyes during visits on June 26, 2017; October 2, 2017; January 19, 2018; and February 1, 2018, without any plan or assessment addressing it. R. at 659-60, 662-63, 664-65, 667-68.

Mr. Rixner presented at the Teche Action Clinic on October 17, 2019, for follow-up of routine health maintenance, hypertension, and seizure disorder. R. at 382. It was noted that his last seizure was two years earlier. Id.  He reported no eye pain, loss or blurring of vision, or double vision. R. at 383. On examination, it was noted that Mr. Rixner's eyes had normal orbit and globe, normal conjunctivae, normal cornea, and normal lids. R. at 384. His pupils were equal in size, round, and reactive to light and accommodation. Id.  His vision was normal to finger count. Id. The medical plan did not include any vision-related instructions.

During a February 20, 2020, visit to the Teche Action Clinic, Mr. Rixner again reported no eye pain, no loss or blurring of vision, and no double vision. R. at 379. Like in October 2019, his vision was normal to finger count and no abnormalities were noted. Id.

Mr. Rixner presented for a consultative eye examination on August 21, 2020. R. at 408. The examining physician found his uncorrected vision was 20/25 for distance in the right eye, 20/40 for distance in the left eye, and 20/70 for near in both the right and left eyes. Id. With best correction, his distance vision was 25/20 in both eyes and his near vision was 20/20 in both eyes. Id. The examiner also noted that Mr. Rixner could not read find print or large print, could not handle work with large objects, could not drive an automobile or operate machinery, and could not avoid objects in workplace pathways or people approaching from the side. Id.

Mr. Rixner presented for a consultative examination with Dr. Scott M. Sondes on September 9, 2020. R. at 413. On a review of systems, Mr. Rixner reported wearing prescription glasses. R. at 414. On physical examination, Dr. Sondes noted that Mr. Rixner's pupils were equal, round, and react to light and accommodation. R. at 415. His extraocular movements were intact without nystagmus. Id. Sclerae and conjunctivae were normal. Id. His best visual acuity without correction was 20/40 on the left and 20/50 on the right. Id. Dr. Sondes diagnosed Mr. Rixner with status post severe head trauma-TBI now with mild left hemiparesis, seizure disorder, cognitive issues, mental health issues as a result of TBI, and pruritis. R. at 417. No visual diagnoses were noted. Id.

### 3. Evidence of Mental Impairments

Mr. Rixner presented at the Teche Action Clinic on Oct. 30, 2015. R. at 400. He complained of back pain, forgetfulness, and seizures. R. at 400. Nonetheless, his recent and remote memory were noted to be intact on examination. R. at 403. No psychiatric symptoms were reported. R. at 402.

Mr. Rixner presented to a neurology clinic at HCMC Hospital on August 31, 2016, for management of epilepsy. R. at 564. He reported a history of head trauma due to two motor vehicle

accidents in the 1990s. Id. He reported a history of alcohol use disorder and stated his last drink was two days before his last seizure in May. Id.  He moved to Minnesota for rehab shortly thereafter and had not had a seizure since. Id.

Mr. Rixner presented at the NorthPoint Health and Wellness Behavioral Health Clinic for a diagnostic assessment on January 27, 2017. R. at 775-76. He reported symptoms of depression and anxiety. R. at 776. He also reported currently seeking inpatient alcohol treatment to comply with his employer's human resources request to meet requirements to remain on long term disability. Id. His judgment and insight were fair. R. at 780. He was easily distracted. Id.  His immediate and short term memory were noted to be impaired. Id.  It was recommended that his symptoms and behaviors be monitored, and that he continue individual therapy. R. at 781.

Mr. Rixner began individual therapy with intern Jennifer Waltman on February 3, 2017. R. at 772. He presented approximately weekly over the next five months, with a break for a visit back home to Louisiana in May. During his February 17, 2017, session, he completed a mini-mental status examination and scored 22 out of 30. R. at 769. It was noted that a score of 23 or lower is indicative of cognitive impairment. Id.  During Dr. Rixner's first few months of therapy with Waltman, he reported declining memory, some issues with volatile mood, and sleep problems. In April, he reported that he did not trust his psychiatrist Dr. Alston, but that he had agreed to take his medication so that he could go to Louisiana. R. at 736.  A month later on May 12, 2017, he reported that he felt more calm and relaxed and that "he hated to admit it, but . . . his prescribed medication may be helping him to regulate his mood." R. at 731. His June 26, 2017, session was spent processing what he described as his frustration at not being able to get real work because his medical providers would not let him drive. R. at 719.

When Waltman's internship terminated, Mr. Rixner began seeing Steven Cambrice for therapy about once a week or every other week. His first session was on July 13, 2017. R. at 710. In early sessions, they discussed family issues and grief and a sense of inadequacy as a result of not being able to work due to his health issues. R.at 703-706. In his August 29, 2017, session he reported an improvement in mood. R. at 698. Over the next few months he sometimes reported irritable interactions with others, but frequently reported some progress or improved mood. R. at 697-670. The last therapy session of record is dated February 13, 2018. R. at 669.

Meanwhile, Mr. Rixner presented to Dr. Roderick Alston, psychiatrist, on March 6, 2017. R. at 758. He reported he was presenting for medication management because that is what everyone was telling him he needed to do. R. at 759. He described his mood as "I don't care anymore." Id. He reported he was not getting anything done, that he was forgetting things, and that he was putting things in the wrong place. Id. But Dr. Alston also noted that Mr. Rixner was able to give full recall and in detail the events leading up to his head injuries. Id. Dr. Alston noted that Mr. Rixner appeared to have some type of memory or cognitive defects reportedly related to head injury and seizures. R. at 761. Dr. Alston noted that Mr. Rixner was somewhat vague and evasive. Id. He recommended cognitive testing given his presentation and lack of any objective information to correlate his current symptoms. Id. He diagnosed Mr. Rixner with adjustment disorder with mixed anxiety and depressed mood, rule our neurocognitive disorder. Id.

Mr. Rixner established care at Northpoint Health & Wellness Center on March 21, 2017. R. at 653. He was assessed with seizure disorder, hypertension, and aortic valve sclerosis. R. at 657. He complained of a panic attack two weeks earlier while assessing a job site. Id. He also complained of progressively worsening low back pain. Id. Mr. Rixner also met with Dr. Alston in

psychiatry on March 21, 2017. R. at 749. He reported not wanting to be bothered and being easily distracted. R. at 750. Some improvement with tracking and memory was noted. R. at 751.

Mr. Rixner followed up with Dr. Alston at Northpoint on April 18, 2017. R. at 737. He reported that he forgets things a lot. R. at 738. He reported that he was not really anxious and that he was sleeping better. Id.

Mr. Rixner followed up with Dr. Alston at Northpoint on May 16, 2017, for medication management. R. at 726. His mood was improved, and he had decreased anxiety. R. at 727. He had minimal complaints of memory problems. Id.

Mr. Rixner presented at the Hennepin County Medical Center on May 25, 2017, and a neuropsychological evaluation was performed by Scott G. Miller, PsyD, LP, on referral from Dr. Alston at Northpoint. R. at 800. Mr. Rixner reported he was misplacing paperwork and objects, though he also reported improved recall of appointments and taking medication after writing it down. Id. He acknowledged some decline in recall of conversational details and stated that his memory issues were progressive. Id. Mr. Rixner was alert and cooperative. R. at 801. His conversational speech was grossly intact and he did not exhibit a thought disorder. Id. Dr. Miller noted "at most mild comprehension issues in response to task directives." Id. Mr. Rixner was at most mildly restless. Id. He persevered and Dr. Miller noted the findings should be viewed as a valid and reliable measure of Mr. Rixner's current neuropsychological functioning. Id. Dr. Miller found Mr. Rixner's working memory was generally mildly below average and his figural recall capabilities were within or approximated the average range. Id. His rate of learning and recalling word list information repetitiously presented was mildly below average expectancy. Id.

Dr. Miller found that Mr. Rixner's executive/conceptualization and divided attention abilities were in the borderline range and a mild weakness was evidenced for verbal

learning/memory and aspects of language and visuospatial abilities. Id. His processing and bilateral motor speed was mildly slow, while his psychiatric status included a history of alcohol abuse with current questionnaire responses implicating a severe level of depression without suicidal ideation. Id. Dr. Miller noted that Mr. Rixner can facilitate recall by continuing to write down information and/or also programming a cell phone, which would allow rehearsal and cuing of important material. Id. Dr. Miller further recommended that Mr. Rixner maintain sobriety, remain compliant with seizure medication, and manage depression with psychotherapy and/or medication to optimize functioning. R. at 801-02.

Mr. Rixner followed up with Dr. Alston at Northpoint on June 13, 2017, for medication management. R. at 723. His mood was much better. R. at 724. He was sleeping well, he had minimal complaints of memory problems, and he had no side effects. Id. His judgment and insight were fair. R. at 725. His recent and long-term memory were noted to be impaired, but it was also noted that he had no complaints today. Id. He endorsed a decline in concentration, but also noted this was improving. Id.

Mr. Rixner presented to Dr. Alston for medication management on July 11, 2017. R. at 711. His mood was good and his anxiety was pretty low. R. at 712. He had minimal complaints of memory problems and no medication side effects. Id. He reported trying to socialize more. Id. He noted he was still distractable. Id.

Mr. Rixner presented for a psychological examination with Dr. Jennica Tomassoni on September 7, 2017. R. at 633. He was a fair to poor historian and seemed somewhat confused and disoriented. R. at 636. He was oriented to person, place, and time, and maintained adequate eye contact. Id. There were no signs of thought disorder and he denied hallucinations. Id. He seemed anxious. Id. He seemed to give his best effort. Id. He was somewhat distractable and the

psychiatrist noted that Mr. Rixner may have had difficulties with inattention and concentration as well as overall stamina during the evaluation. Id. Mr. Rixner had borderline intellectual ability, but struggled significantly with issues related to attention and concentration. Id. Mr. Rixner's processing speed was noted to be a general weakness. Id. Memory difficulties were also observed, although the examiner noted these were not extremely prominent on the WAIS-IV test. R. at 639. He was assessed with a Full Scale IQ of 76. R. at 637.

On September 21, 2017, Mr. Rixner presented at Natalis Counseling & Psychology Solutions for ADHD testing. R. at 641. He reported difficulties with focus, attention, and remembering things. Id. He reported that he enjoys reading a great deal. R. at 644

He returned to Dr. Alston at Northpoint on November 30, 2017, for medication management. R. at 682. His mood was good and his anxiety was low. Id. He had no complaints of memory problems or medication side effects. Id. His judgment and insight were fair. R. at 684. His concentration was normal. Id. His recent and long-term memory were noted to be impaired, although it was also noted that Mr. Rixner had no complaints that day. Id.

Mr. Rixner presented to Northpoint on January 9, 2018, for medication management and reported doing great after visiting family in Louisiana. R. at 680. His mood was good, his anxiety was low, and he was sleeping well. Id. He denied complaints of memory problems or any medication side effects. Id. On mental status examination, his eye contact was fair, his associations were intact, his thought process was logical and his thought content was unremarkable. Id. His insight and judgment were fair. R. at 681-82. His recent and long term memory were intact. Id. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood, mild neurocognitive disorder, unspecified insomnia, moderate alcohol use disorder in remission, and unspecified depressive disorder. Id.

Mr. Rixner presented to Northpoint on January 11, 2018, for therapy and a progress update. R. at 678. He reported improved mood. Id.  His mood was stable and his affect was appropriate/mood-congruent. Id. His judgment and insight were fair. Id.

During Mr. Rixner's follow up appointment at Teche Action Clinic (back in Louisiana) on October 17, 2019,[2] he reported symptoms of anxiety. R. at 383. Upon examination, it was noted that Mr. Rixner had appropriate judgment, good insight, and proper orientation to time, place, and person. R. at 384. His recent and remote memory were intact. Id.  His mood was euthymic and his affect was appropriate. Id.

On January 27, 2020, Mr. Rixner presented to Dr. Bertha Davis Williams for therapy. R. at 435. He appeared depressed and stated that he was tired all the time. Id.  He returned for a 60 minute session on February 20, 2020. Id.  He appeared depressed and worried. Id.

Mr. Rixner again reported anxiety during his February 20, 2020, visit to the Teche Action Clinic. R. at 380. As in October 2019, he had appropriate judgment, good insight, and proper orientation to time, place, and person. Id. His recent and remote memory were intact. Id.  His mood was euthymic and his affect was appropriate. Id.

On October 15, 2020, Mr. Rixner presented for a psychological consultative examination with James A. Van Hook, III, Ph.D. R. at 421. Dr. Van Hook observed that Mr. Rixner "did not appear to be reliable about many matters." R. at 422.

> He showed probable evidence of symptom magnification. He reported expense [sic] severe levels of depression and anxiety yet he showed incongruent affect. He also reported expensing [sic] atypical to absurd psychotic like features. His effort with testing was not adequate. He would not try many test items and seemed to give up easily. He made near miss responses. His reliable digit span was not adequate. Digit span with age corrected standard scoring and adjusted for IQ was also not adequate. Current testing was deemed invalid.

[2] Other than therapy sessions through February 2018 as noted above, the record does not contain evidence of mental health complaints or treatment until this October 2019 visit. He treated for backpain with acupuncture and physical therapy from January through March 2018. R. at 890-920; see R. at 663-66.

Id.

Almost ten months after his previous visit, Mr. Rixner returned to Dr. Williams on December 8, 2020, to participate in a telehealth session. Id.  He sounded stressed and depressed. Id.  He reported that everything was confusing and that his memory was so bad he had to write everything down. R. at 436.

Dr. Williams performed a mental residual functional capacity assessment on December 16, 2020. R. at 437. She classified him as having marked limitations in social functioning and with activities of daily living. Id.  She classified him as having extreme limitations with understanding and memory and with concentration, persistence, and pace. Id. She reported that his condition appears to worsen over time. Id.  She opined that Mr. Rixner would be unable to comply with schedules, quotas, and time restraints. Id.  She also opined that he would have limitations in his ability to work with the public, coworkers, and supervisors. Id

Mr. Rixner returned to Dr. Williams October 20, 2021. R. at 923. His memory was noted to be impaired. R. at 924. Dr. Williams opined that Mr. Rixner was unable to work due to his physical and mental conditions. Id.  The responses on the form regarding Mr. Rixner's limitations and ability to work were identical to the form Dr. Williams prepared on December 16, 2020. R. at 925.

## Decision of the Administrative Law Judge

The ALJ determined that Mr. Rixner met the insured status requirements of the Act through December 31, 2016. The ALJ also found that Mr. Rixner has not engaged in substantial gainful activity since his alleged disability onset date of September 1, 2016.

The ALJ found that Mr. Rixner has the following severe impairments:  epilepsy; disorder of the muscle, ligament, and fascia; and anxiety. The ALJ next considered whether Mr. Rixner has

an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Of relevance to the pending appeal, the ALJ considered listing 11.02 for epilepsy and listing 12.06 for anxiety and obsessive-compulsive disorders. The ALJ found Mr. Rixner's impairments did not meet or medically equal the criteria of either listing.

The ALJ next found that Mr. Rixner has the following residual functional capacity ("RFC"): he can perform light work as defined by the regulations, with the additional limitation to occasionally lifting and/or carrying 20 pounds and frequnetly lifting and/or carrying ten pounds; standing and/or walking for about six hours in an eight-hour workday; and sitting for about six hours in an eight hour work day all with normal breaks. He was further limited to never climbing ladders, ropes, or scaffolds, and must avoid all exposure to unprotected heights, dangerous machinery, and moving machinery. He was also limited to jobs requiring that he understand, carryout, and remember simple instructions and make commensurate work-related decisions; respond appropriately to supervision, coworkers, and work situations; deal with routine changes in work setting; maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout a normal work day; perform simple, routine, and repetitive tasks; and occasionally interact with coworkers, supervisors, and the general public.

The ALJ concluded that Mr. Rixner is not able to perform any of his past relevant work. However, the ALJ found that considering Mr. Rixner's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. Accordingly, the ALJ concluded that Mr. Rixner has not been under a disability as defined by the Act from September 1, 2016, through the date of the decision.

## Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ considered all of the claimant's medically determinable impairments and symptoms when formulating the RFC.

Issue No. 2.    Whether the ALJ erred in failing to consider if the claimant's impairments meet or medically equal listing 11.04C and 12.02.

Issue No. 3.    Whether the ALJ failed to consider all medical opinions in the record.

Issue No. 4.    Whether the ALJ relied on the vocational expert's testimony in violation of Social Security Ruling 00-4p.

Issue No. 5.    Whether the ALJ erred in limiting the time for claimant's counsel to question the Vocational Expert and refusing to allow the Vocational Expert to answer interrogatories proposed by claimant's counsel.

Issue No. 6.    Whether the ALJ erred in asking the vocational expert about the effect of the claimant's visual limitations on his ability to work despite finding that the claimant's vision impairment was non-severe.

Issue No. 7.    Whether the ALJ erred in prohibiting claimant's counsel from asking the claimant leading questions even though the claimant alleges mental impairments and even though the ALJ asked leading questions of the Vocational Expert.

Issue No. 8.    Whether the ALJ erred in addressing claimant's counsel's objections.

<u>**Analysis**</u>

## I. <u>Standard of Review.</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Hames v. Heckler</u>, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (quoting <u>Consol. Edison Co. of New York v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. <u>Perez</u>, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled, her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work

in the national economy." Id. Once the Commissioner has made this showing, the claimant bears

the burden to rebut the finding. Id.  An assessment of the claimant's RFC is used in steps four and

five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.    Plaintiff's Appeal.

*Issue No. 1.    Whether the ALJ considered all of the claimant's medically determinable impairments and symptoms when formulating the RFC.*

Mr. Rixner argues that he has severe visual limitations, yet the ALJ did not include any

limitations for his visual impairment in the RFC. He argues that the ALJ improperly found his

visual impairments non-severe because Mr. Rixner did not include vision problems in his function

report. Mr. Rixner seems to argue that because he has a cognitive impairment, his failure to

describe visual impairments should not count against him. He cites the consultative eye

examination finding that Mr. Rixner cannot read fine or large print, cannot handle and work with

large objects, cannot drive an automobile or operate machinery, and cannot avoid objects in

workplace pathways or people approaching from the side. Mr. Rixner further argues that his

inability to see and his inability to interact appropriately with supervisors, coworkers, and the

public in limited situations would have eroded the occupational workplace.

The Commissioner responds that the ALJ properly considered Mr. Rixner's complaints

and impairments when formulating the RFC. The Commissioner argues that the ALJ properly

found that Mr. Rixner's visual impairments were not severe. She points to medical evidence

assessing Mr. Rixner's corrected vision at 20/20 for near and 20/25 for distant and evidence that

Mr. Rixner wears prescription glasses. The Commissioner submits that courts have found that an

ALJ can consider a claimant's failure to list an impairment in his disability application. See Jones

v. Bowen, 829 F.2d 524, 526 (5th Cir. 1987) (finding that the claimant had not established a mental

impairment and that the ALJ had no duty to order a mental consultative examination where the

claimant did not list a mental impairment on his original request for benefits, never requested a consultative examination, and merely cited two medical records in which he reported to a physician that he had become emotionally upset and that he was grouchy, angry, and depressed about not being able to work).

The Court finds that substantial evidence supports the ALJ's conclusion that Mr. Rixner's visual impairments are non-severe. The ALJ recognized Mr. Rixner's best, uncorrected visual acuity of 20/40 on the left and 20/50 on the right, but then also observed that Mr. Rixner wears prescription glasses. As a result, he is not operating with uncorrected vision. The ALJ also considered that the consultative examiner found Mr. Rixner's pupils were equal, round, and react to light and accommodation, that his extraocular movements were intact without nystagmus, and that his sclerae and conjunctivae were normal. Indeed, although Mr. Rixner cites the consultative eye examination where the physician circled "no" in response to all of the questions about Mr. Rixner's capabilities, that same examination reflects Mr. Rixner's best corrected vision was 20/20 bilateral for near and 20/25 for distant. R. at 408. The only rational interpretation of the consultative examiner's opinion is that Mr. Rixner could not perform the listed tasks with uncorrected vision.

Mr. Rixner further claims that his failure to list vision issues in his functional report should not count against him because he is cognitively impaired. Even if this were a valid basis to ignore his failure to mention vision problems, the function reports completed by his aunt did not mention any vision problems either. On the page listing 19 items and asking that the writer check any that the claimant's conditions affect, she did not check the box for "seeing." R. at 286, 310.

Mr. Rixner also makes passing reference to a 2016 medical record in which "pterygium and suspicious optic nerve cupping of both eyes" was listed on the problem list. R. at 655.

However, the medical provider offered no assessment or plan related to vision. R. at 656-57. The same item is included in the problem during visits on June 26, 2017; October 2, 2017; January 19, 2018; and February 1, 2018, without any plan or assessment addressing it. R. at 659-60, 662-63, 664-65, 667-68. There is no indication that this condition caused any impairment or limitation.

Mr. Rixner mentions the consultative examination with Dr. Sondes on September 9, 2020, when Mr. Rixner reported wearing prescription glasses. He points out that Dr. Sondes assessed Mr. Rixner's best visual acuity without correction was 20/40 on the left and 20/50 on the right. R. at 415. Again, though, Mr. Rixner is not operating with uncorrected vision. Further, it was Dr. Sondes who found Mr. Rixner's eyes normal on examination, and Dr. Sondes did not include any vision or eye related diagnoses in his assessment.[3]

As discussed above, the substantial evidence standard requires only that the record contains evidence that a reasonable mind might accept as adequate to support the ALJ's conclusion. See Biestek, 139 S. Ct. at 1154. Here, substantial evidence supports the ALJ's conclusion that Mr. Rixner's visual impairments are non-severe. Further, substantial evidence supports the ALJ's decision not to include any limitations related to vision in Mr. Rixner's residual functional capacity.[4]

Issue No. 2.    *Whether the ALJ erred in failing to consider if the claimant's impairments meet or medically equal listing 11.04C and 12.02.*

Mr. Rixner argues that the record establishes that Mr. Rixner meets or medically equals the listings 12.02 and 11.04C. He does not explain why.

---

[3] Mr. Rixner also cites medical records from 2011—five years before the alleged disability onset date—that are apparently not in the record but which reference (1) headache and visional difficulties that seem to be episodic and (2) reflect follow-up for seizures with possible thrombosis. Even if these medical records were properly in the record, they are from long before the relevant period and, moreover, do not support finding that Mr. Rixner's visual impairment is severe.

[4] The Commissioner's brief also goes through an analysis of the ALJ's consideration of Mr. Rixner's seizure disorder and back pain. Because Mr. Rixner does not challenge any of the other parts of the ALJ's severity findings or RFC assessment, he has waived any right to challenge them and the Court does not address them here.

The Commissioner argues that although the ALJ did not explicitly consider listing 11.04C and 12.02, the ALJ assessed the relevant criteria of those listings in the ALJ's consideration of listings 11.02 and 12.06. The Commissioner argues that Mr. Rixner has not demonstrated that he meets or medically equals a listed impairment.

The Court finds that the ALJ's analysis of the listings is supported by substantial evidence and that Mr. Rixner has not established that he meets or medically equals listing 11.04C or 12.02. Listings 11.02 and 12.06 concern epilepsy and anxiety, respectively. Among the ways to meet Listing 11.02 is to satisfy the requirements of subparagraph C or subparagraph D, which each include the requirement that the claimant has a marked limitation in 1. physical functioning; 2. understanding, remembering, or applying information; 3. interacting with others; 4. concentrating, persisting, or maintaining pace; or 5. adapting or managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The regulations explain that "a marked limitation means that, due to the signs and symptoms of your neurological disorder, you are seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings." Id. Further, although the agency does not use a scale, "'marked' would be the fourth point on a five-point scale consisting of no limitation, mild limitation, moderate limitation, marked limitation, and extreme limitation." Id.

Similarly, one of the ways to meet listing 12.06 requires an extreme limitation of one or a marked limitation of two of the areas of mental functioning listed in 2-5 above. Id. The other way to meet listing 12.06 is provided in subparagraph C and requires that the claimant's mental disorder is "serious and persistent," which means that the claimant has:

> A medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

Id.

Mr. Rixner invokes listing 11.04C, which is for "vascular insult to the brain." Id. To meet this listing, the claimant must establish a marked limitation, persisting for at least 3 consecutive months after insult, in the areas of mental functioning listed in 2-5 above. In considering these areas of mental functioning, the ALJ found that Mr. Rixner has a moderate limitation in all four.

As to understanding, remembering, or applying information, the ALJ considered that Mr. Rixner demonstrated intact short-term and long-term memory function in completion of function reports, the disability report, and the work history report that were part of his disability benefits application. The ALJ also considered that Mr. Rixner can follow through with medical advice and a prescribed treatment regimen. Finally, the ALJ considered that Mr. Rixner was able to provide relevant details of background information to examiners, particularly involving employment and medical histories. The ALJ concluded Mr. Rixner had a moderate limitation in understanding, remembering, or applying information.

As to interacting with others, the ALJ considered that Mr. Rixner was divorced and currently supported by his daughters and other family. The ALJ considered that on mental status examination with Dr. Van Hook, Mr. Rixner was not in acute distress and joked at times. He made adequate eye contact. His speech was normal with clear enunciation. His expressive speech was goal-directed, and he had no difficulty carrying on a conversation. He showed adequate receptive language for following test directives. The ALJ concluded that Mr. Rixner had a moderate limitation in interacting with others.

As to concentrating, persisting, or maintaining pace, the ALJ considered that on mental status examination with Dr. Van Hook, Mr. Rixner's overall attention and concentration were not adequate. He was not able to correctly recall the days of the week in backward order. He could not repeat an appropriate number of serial digits, and he could not complete mental computation tasks adequately. He reported having memory problems with loss of consciousness. His persistence was not adequate. But he would not answer some questions and showed possible evidence of suboptimal effort. The ALJ also considered that according to Mr. Rixner's function report, he is capable of personal care, can shop in stores, can count change, and can spend time with others. He believes his condition affects his ability to remember, complete tasks, concentrate, understand, follow instructions, and get along with others. The ALJ concluded that Mr. Rixner had a moderate limitation in concentrating, persisting, or maintaining pace.

As to adapting or managing oneself, the ALJ considered that Mr. Rixner did not appear to be in acute distress and his affect was stable on mental status examination with Dr. Van Hook.  He had no difficulty regulating his affect during the examination. He made adequate eye contact and was able to interact adequately on a one-to-one basis. He answered no questions in an aggressive manner. The ALJ also considered that Mr. Rixner's level of adaptation per self-report to Dr. Van Hook was poor. He stated he spends a typical day staying away from others. He reported poor maintenance of household chores and poor safety and hazard awareness. The ALJ concluded Mr. Rixner has a moderate impairment in adapting or managing himself.

Mr. Rixner argues merely that the evidence establishes that he meets or medically equals listing 11.04C. He does not identify any areas of mental functioning in which the ALJ should have found a marked or extreme impairment. He summarizes some medical evidence, but he does not indicate which he believes support his position. He cites the opinions of state agency medical

consultant Dr. Wise, Dr. Davis-Williams, Dr. Farrell, and Dr. Sondes. The ALJ considered and assessed each of these opinions. The only one of them that could support a finding of marked or extreme limitations are the opinions of Dr. Williams. The ALJ found her opinion persuasive but that it overstated the extent of Mr. Rixner's limitations. The ALJ observed that Dr. Williams opined that Mr. Rixner's mental and physical illness rendered him unable to work and that he has had continuous episodes of deterioration or decompensation. The ALJ found there was "simply no support in the medical evidence for such pessimistic opinion." R. at 21. The ALJ observed that Mr. Rixner can perform personal hygiene and bathing without assistance; that he denied current suicidal ideation, homicidal ideation, paranoid ideation, and auditory hallucinations; and that during examination he made adequate eye contact, had no difficulty carrying on a conversation and was observed to be in no acute distress with stable affect and no difficulty regulating his affect. The ALJ added that Dr. Williams' opinion about Mr. Rixner's ability to work is reserved for the Commissioner. The Court finds that the ALJ's assessment of Dr. Williams' opinions is reasonable and supported by substantial evidence. Further, the Court finds that Mr. Rixner has failed to establish that he has a marked impairment in any of the areas of mental functioning listed in 2-5 above.

Mr. Rixner also invokes listing 12.02, which is for neurocognitive disorders. Like listing 12.06 considered by the ALJ, one of the ways to satisfy listing 12.02 requires the claimant to establish an extreme limitation in one or a marked limitation in two of the areas of mental functioning listed in 2-5 above. The other way to meet listing 12.02 is provided in paragraph C and requires the claimant to establish that his mental disorder is "serious and persistent" under the identical standard as described above for listing 12.06.

The court has already considered the ALJ's analysis and findings as to the areas of mental functioning listed in 2-5 and determined them to be supported by substantial evidence. As to the "serious and persistent" standard of 12.06(C), the ALJ found that the record does not establish that Mr. Rixner has only marginal adjustment, i.e., a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. The ALJ found no evidence of repeated episodes of decompensation. The ALJ found no evidence that Mr. Rixner realizes a highly supportive living arrangement or that he is unable to function independently outside of the home.

Mr. Rixner argues merely that the evidence establishes that he meets or medically equals listing 12.02. He does not argue which evidence supports finding that the requirements of 12.02(C) have been met. As noted above, the ALJ analyzed Dr. Davis-Williams' opinion and found that although it was persuasive, it overstated Mr. Rixner's limitations. The Court finds that the ALJ's conclusions regarding the requirements of listing 12.02(C) are supported by substantial evidence and that Mr. Rixner has failed to establish that he meets the listing.

To the extent Mr. Rixner argues that he "medically equals" as opposed to "meets" one of the listings, the Commissioner points out that under Social Security Ruling 17-2p

> If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. *Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding.* An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

Soc. Sec. Ruling (SSR) 17-2p: Titles II & XVI: Evidence Needed by Adjudicators at the Hearings & Appeals Council Levels of the Admin. Rev. Process to Make Findings About Med. Equivalence,

SSR 17-2P (S.S.A. Mar. 27, 2017) (emphasis added). The Commissioner submits that here, the ALJ clearly articulated that Mr. Rixner does not have an impairment that meets or medically equals the severity of one of the listed impairments. The Court agrees with the Commissioner and notes that Mr. Rixner has not explained his theory of medical equivalence, if any. The Court finds the ALJ's conclusion that Mr. Rixner's impairments do not medically equal a listed impairment is supported by substantial evidence.

*Issue No. 3.    Whether the ALJ failed to consider all medical opinions in the record.*

Mr. Rixner lists as an issue that the ALJ did not consider all the medical opinions in the record. He does not identify which medical opinion the ALJ failed to consider. In his summary of the medical evidence, he mentions the opinions of Dr. Wise, Dr. Davis-Williams, Dr. Farrell, Dr. Sondes, Dr. Upham, and Dr. Ngo. Presumably he takes the position that one of these was not considered. The Court notes that the ALJ considered and assessed the opinions of Dr. Wise, Dr. Williams, Dr. Farrell, Dr. Sondes, thus there can be no error in the ALJ's failure to consider these opinions.[5]

As to Dr. Upham, the cited medical record does not contain any opinions, but it does reflect an eye examination that Mr. Rixner underwent on November 7, 2016. Mr. Rixner complained that it was hard to see near and hard to see fine print. He was prescribed glasses. His visual acuity was measured at 20/20. He was diagnosed with suspicious optic nerve cupping, bilateral and prescribed eye drops. Nothing in this record indicates remotely severe vision problem or any visual limitations. To the extent this record amounts to a medical opinion, the ALJ's failure to consider

---

[5] The only medical opinion that the court located on its review of the record that was not discussed by the ALJ is the 2017 neuropsychological evaluation by Dr. Miller. But Dr. Miller concluded that Mr. Rixner had only mild comprehension issues and working memory that was mildly below average, while his figural recall capabilities were average. Dr. Miller's opinion would not support a finding of a marked limitation in an area of mental functioning, nor would it support further mental limitations in the RFC. Thus, any error in the ALJ's failure to analyze this opinion was harmless.

it was a harmless error[6] because nothing in this record could have resulted in finding Mr. Rixner's visual impairments to be severe or that visual limitations should have been included in the RFC.

As to Dr. Ngo, the cited record indicates that a consultative examination was performed on August 21, 2020.[7] Without correction, Mr. Rixner's vision was noted to be 20/25 in the right eye for distance and 20/40 in the left. But with best correction, Mr. Rixner's visual acuity was 20/20 for distance. For near visual acuity, Mr. Rixner's uncorrected vision was 20/70 in both eyes, but 20/20 with correction. Dr. Ngo circled "No" in response to whether Mr. Rixner could read fine print or large print, handle work with large objects, drive an automobile, operate machinery, and avoid objects in workplace pathways or people approaching from the side. As the court found above, the only rational way to read these opinions consistently with the visual acuity results, though, is that Mr. Rixner could not do these things without corrected vision. The record is clear that Mr. Rixner wore prescriptive glasses. The ALJ should have considered Dr. Ngo's opinion. However, the ALJ's failure to do so was harmless because nothing in this record could have resulted in finding Mr. Rixner's visual impairments to be severe or that visual limitations should have been included in the RFC.

The court finds no basis for remand in the ALJ's failure to consider a medical opinion.[8]

---

[6] "Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989) (quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)). "Where the resulting disability determination remains unchanged, even if some of the reasoning underlying that decision is erroneous, no substantial rights have been affected." Qualls v. Astrue, 339 F. App'x 461, 464 (5th Cir. 2009). Remand is required only where the improprieties cast doubt on the existence of substantial evidence to support the ALJ's decision. Id.; Keel v. Saul, 986 F.3d 551, 556 (5th Cir. 2021) (""Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err.").

[7] The name of the physician is actually illegible and not typed anywhere on the report. For purposes of this report and recommendation, the court assumes the document in the record is the opinion of Dr. Ngo as represented by Mr. Rixner's counsel.

[8] The Commissioner's brief argues that the ALJ properly analyzed the opinions that he did assess. Mr. Rixner's brief does not challenge the ALJ's decision on that basis, and the Court does not address that argument here.

*Issue No. 4.    Whether the ALJ relied on the vocational expert's testimony in violation of Social Security Ruling 00-4p.*

While the DOT is relied on "for information about the requirements of work in the national economy," a vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions, SSR 00-4P (Dec. 4, 2000). A vocational expert's testimony "generally should be consistent with the occupational information supplied by the DOT." Id. The burden is on the adjudicator to "elicit a reasonable explanation for the conflict" when there exists "an apparent unresolved conflict between VE or VS evidence and the DOT." Id. At the hearing, it is the adjudicator's duty to "fully develop the record" and inquire on the record "whether or not there is such consistency" in the vocational expert's testimony. Id. An affirmative responsibility rests on the adjudicator "to ask about any possible conflict between that VE or VS evidence and information provided in the DOT" when a vocational expert "provides evidence about the requirements of a job or occupation." Id. A vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." Id.

Importantly, though, "claimants are not permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." Carey v. Apfel, 230 F.3d 131, 146-47 (5th Cir. 2000). Moreover, even if an ALJ has erred in failing to discover and address a conflict, the claimant is only entitled to relief if "she can establish that she has been prejudiced by the alleged error." DeLeon v. Barnhart, 174 F. App'x 201, 203 (5th Cir. 2006)

Here, Mr. Rixner argues that the vocational expert's testimony was inconsistent with Social Security Ruling 00-4p. He offers no further explanation. He identifies no conflicts. He has failed to show any prejudice from the ALJ's reliance on the vocational expert's testimony.

*Issue No. 5.    Whether the ALJ erred in limiting the time for claimant's counsel to question the Vocational Expert and refusing to allow the Vocational Expert to answer interrogatories proposed by claimant's counsel.*

"[T]he regulations do not require the use of the formal rules of evidence at an administrative hearing." Vaughan v. Shalala, 58 F.3d 129, 132 (5th Cir. 1995). Nonetheless, the claimant is entitled to due process. See Bayer v. Colvin, 557 F. App'x 280, 286 (5th Cir. 2014); Norden v. Barnhart, 77 F. App'x 221, 223 (5th Cir. 2003); Francisco v. Barnhart, 366 F. Supp. 2d 461, 466 (S.D. Tex. 2004); Pate v. Astrue, No. CIV.A. H-08-249, 2009 WL 4825206, at *9 (S.D. Tex. Dec. 8, 2009); Satterfield v. Astrue, No. 2:06-CV-0226, 2009 WL 3028645, at *8 (N.D. Tex. Sept. 22, 2009). For example, the Fifth Circuit has held that a claimant has a right to cross-examine a reporting physician. Lidy v. Sullivan, 911 F.2d 1075, 1077 (5th Cir. 1990); Tanner v. Sec'y of Health & Hum. Servs., 932 F.2d 1110, 1112 (5th Cir. 1991). And the regulations prohibit an ALJ from conducting a hearing "if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." 20 C.F.R. § 404.940. Of note, though, "[j]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge" unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999).

A claimant also has the right to cross-examine the vocational expert. Vaughan, 58 F.3d at 132. But that right is not unlimited. In Vaughn, the claimant argued "she was denied a full and fair hearing because the ALJ asked leading questions of the vocational expert, misstated her disabling

conditions in a hypothetical question, refused to let counsel fully cross-examine the vocational expert, and refused to give counsel access to the vocational expert's notes." Id. But the Fifth Circuit found no reversible error, noting that the ALJ had "allowed [claimant's] counsel to cross-examine the vocational expert extensively, including the subject matter of the challenged hypothetical." Id.; see Bayer, 557 F. App'x at 286 (holding that the ALJ did not err in denying the claimant's request to submit a hypothetical to the vocational expert where the claimant had the opportunity cross-examine the vocational expert at the hearing). Indeed, while the SSA's Hearings, Appeals, and Litigation Law Manual (HALLEX) recognizes that "[t]he claimant and the representative have the right to question the VE fully on any pertinent matter within the VE's area of expertise," the manual provides further that "the ALJ will determine when they may exercise this right and whether questions asked or answers given are appropriate." Hearings, Appeals, and Litigation Law Manual (HALLEX), I-2-6-74C, https://www.ssa.gov/OP_Home/hallex/I-02/I-2-6-74.html (last updated June 16, 2016).

Mr. Rixner argues that the ALJ erred in limiting the time that his counsel was permitted to question the vocational expert and by refusing to require the vocational expert to answer interrogatories propounded by counsel following the hearing. The Court disagrees.

The hearing transcript reflects that Mr. Rixner was given a full opportunity to cross-examine the vocational expert. He was allowed to use leading questions. The ALJ did not instruct Mr. Rixner's counsel to complete his questioning. Instead, Mr. Rixner's counsel was allowed to continue questioning the vocational expert until he was finished. It is true that he was not allowed to repeatedly ask the vocational expert whether a person with a loss of 50 percent of their vision could work. However, that is because the vocational expert testified she would need additional information to be able to answer that question. The ALJ instructed counsel to ask his questions

using vocationally relevant terms. Counsel did so and received substantive responses. When he tried again to ask the 50 percent vision loss question, the ALJ reminded counsel that the vocational expert had not felt comfortable answering the questions and instructed counsel to use vocationally relevant terms. Instead, counsel said "Well I don't want to waste anymore of the Court's time if that's the vocational expert's opinion that she feels he could work. Why ask any more questions then?" R. at 61. It was counsel's decision not to ask questions about visual limitations in a way the vocational expert could respond. After asking an additional question about use of the non-dominant hand, Mr. Rixner's counsel concluded "Judge, I'm going to object to this hearing and this testimony." In doing so, he clearly indicated that he had no further questions for the vocational expert. Indeed, he did not suggest to the ALJ that he would be sending proposed interrogatories. Mr. Rixner's due process rights were not violated because his counsel was allowed a full opportunity to cross-examine the vocational expert. Further, because Mr. Rixner's counsel was allowed to cross-examine the vocational expert, there is no error in the ALJ's failure to instruct the vocational expert to answer Mr. Rixner's proposed interrogatories. See Bayer, 557 F. App'x at 286 ("We conclude that the ALJ did not deny Bayer his procedural due process rights because Bayer's counsel had the opportunity to fully cross-examine the VE at the administrative hearing.").

Issue No. 6.    *Whether the ALJ erred in asking the vocational expert about the effect of the claimant's visual limitations on his ability to work despite finding that the claimant's vision impairment was non-severe.*

Issue No. 7.    *Whether the ALJ erred in prohibiting claimant's counsel from asking the claimant leading questions even though the claimant alleges mental impairments and even though the ALJ asked leading questions of the Vocational Expert.*

Mr. Rixner argues that he was denied a fair hearing because the ALJ asked the vocational expert about the effect of Mr. Rixner's visual limitations despite having found that Mr. Rixner's visual impairments were non-severe. He further argues that the ALJ improperly prohibited his

counsel from asking him leading questions even though he alleges mental impairments and even though the ALJ asked leading questions of the vocational expert.

The Commissioner points out that Mr. Rixner was allowed to ask leading questions to the vocational expert. She admits that the ALJ intervened at some points of the questioning because Mr. Rixner's counsel was not asking questions using vocationally relevant terms. She notes that counsel was permitted to ask several questions about visual limitations and the use of the non-dominant hand for fine and gross manipulation. The Commissioner argues that Mr. Rixner has not presented any evidence that the ALJ was so highly antagonistic that a fair judgment was impossible. The Commissioner insists that the ALJ's comments do not indicate bias and argues that the decision should not be overturned on this basis.

The Court finds no error in the ALJ's questioning of the vocational expert about visual limitations. Although the ALJ ultimately found Mr. Rixner's visual limitations were non-severe, this does not preclude the ALJ from asking the vocational expert questions arising out of other possible outcomes. Indeed, the ALJ frequently asks the vocational expert a series of hypotheticals, although only one of them ultimately corresponds to the RFC assigned in the ALJ's decision.

The Court also finds no error in the ALJ's prohibiting Mr. Rixner's counsel from using leading questions with Mr. Rixner.[9] The ALJ explained that he preferred non-leading questions because "leading questions really do strip testimony of power for me." R. at 44. Indeed, because a response to a leading question is typically less trustworthy than a response to an open-ended question, the Federal Rules of Evidence only allow the use of leading questions on direct examination "as may be necessary to develop the witness' testimony." Fed. R. Evid. 611(c). The rule reflects "the traditional view that the suggestive powers of the leading question are as a general

_____

[9] Of note, Mr. Rixner's counsel did not request permission to ask leading questions on the grounds of Mr. Rixner's cognitive impairments or any other basis.

proposition undesirable." Id. advisory committee's notes to the 1972 Proposed Rules. Exceptions include hostile witnesses, children, adults with communication problems, a witness whose recollection is exhausted, and undisputed preliminary matters. Id.; see United States v. Dumpson, 70 F.3d 1268 (5th Cir. 1995) (per curium).

As discussed above, the ALJ considered Mr. Rixner's mental impairments as reflected by the medical evidence of record and imposed limitations in the RFC to account for those impairments. Specifically, the ALJ limited Mr. Rixner to work involving simple instructions and simple work-related decisions, limited interaction, and maintaining concentration, persistence, and pace for up to two hours with normal breaks. The Court has found this conclusion was supported by substantial evidence. These limitations and the ALJ's reasonable assessment of Mr. Rixner's mental capabilities do not reflect a severity that would require the ALJ to sua sponte allow Mr. Rixner's counsel to ask him leading questions. Even if Mr. Rixner's mental impairments might have made leading questions permissible, Mr. Rixner has failed to show that the ALJ's refusal to allow leading questions resulted in a denial of due process.

*Issue No. 8.      Whether the ALJ erred in addressing claimant's counsel's objections.*

Finally, Mr. Rixner argues that the ALJ did not properly address his objections. He offers no further explanation of this assignment of error. Of note, Mr. Rixner's counsel told the ALJ at the end of the hearing that the ALJ should issue his opinion without waiting for any written objections, indicating that he intended to raise his objections for appeal and not for consideration by the ALJ. R. at 63 ("Just make your decision. I'll just file a objection to the record stating my objections and the reason for it."). In any event, Mr. Rixner has raised the same objections on appeal to this court and, as discussed herein, the Court has found no error.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 24) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 26) be GRANTED.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 25th day of January, 2023.

Janis van Meerveld
United States Magistrate Judge